***********
Upon review of all of the competent evidence of record with references to the errors assigned and finding no good grounds to reconsider the evidence, receive further evidence, rehear the parties or their representatives, the Full Commission AFFIRMS with some modifications the Opinion and Award of the Deputy Commissioner.
 ***********
The Full Commission finds as a fact and concludes as matters of law the following, which were entered into by parties as:
 STIPULATIONS
1. The Industrial Commission has jurisdiction over the subject matter of this case, the parties are properly before the Commission, and the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act at all relevant times.
2. Defendant was a duly qualified self-insured, with Key Risk Management Services acting as its servicing agent.
3. The employee-employer relationship existed between the parties at all relevant times.
4. Plaintiff's average weekly wage was $711.38, which yields a compensation rate of $474.28 per week, based upon the Form 22.
5. The issues for determination are:
a. Whether plaintiff sustained a compensable injury by accident on October 24, 2002; and
b. Whether plaintiff is entitled to temporary total disability benefits, medical compensation and any other benefits pursuant to the Workers' Compensation Act arising from her injury of October 24, 2002.
7. The parties stipulated the following documentary evidence:
a. Stipulated Exhibit #1: Plaintiff's medical records.
b. Stipulated Exhibit #2: Plaintiff's medical bills.
c. Stipulated Exhibit #3: Form 22 Wage Chart.
 ***********
Based upon all of the competent evidence of record the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was 54 years old. She has been a registered nurse since 1974 and has been employed by defendant as a staff nurse in Student Health Services since September 15, 1998.
2. Plaintiff has chronic asthma and chronic rhinitis, for which she has been treated since 1983 by Dr. Robert Ross, a specialist in allergy and clinical immunology. Dr. Ross has continued to monitor plaintiff's condition on approximately an annual basis. However, Dr. Karen R. Matthews, an internist, has been plaintiff's primary treating physician since 1996.
3. In August 1999, plaintiff requested that Dr. Ross write to her supervisor recommending a change in plaintiff `s work environment. Dr. Ross's letter to plaintiff's supervisor stated that plaintiff's "condition has been worsened by exposure to cigarette smoke in the workplace and I would recommend that she be transferred if at all possible to another work area where this exposure can be avoided." Shortly after Dr. Ross sent the above note, smoking was banned in the building and plaintiff's condition improved.
4. Dr. Ross and Dr. Matthews continued to treat plaintiff in the ensuing years for occasional flare-ups of her condition using medication. Plaintiff missed some days of work, but never required hospitalization.
5. In summer 2002 defendant began a construction project that involved the demolition of a building and the re-paving of a parking lot adjacent to the building that housed the Student Health Services.
6. On July 15, 2002, plaintiff presented to Dr. Ross with an acute exacerbation of irritant bronchitis associated with wheezing. Dr. Ross attributed plaintiff's condition to the remodeling being undertaken at plaintiff's job and to her recent move to a new apartment "which has necessitated considerable dust exposure." Dr. Ross increased plaintiff's medication and wrote her out of work for one week. Plaintiff returned to work at the end of that period and although both Drs. Ross and Matthews again wrote to plaintiff's supervisor seeking a change in the work environment, plaintiff continued to work without undue difficulty until October 24, 2002. As of her October 10, 2002 appointment with Dr. Matthews, plaintiff was taking ten milligrams of Prednisone for her condition.
7. On October 24, 2002, plaintiff arrived at work at 6:30 a.m. She opened the Student Heath Services center, turned on the air conditioning and opened the windows to allow for the movement of air through the building, as was her regular practice. At approximately 7:35 a.m., plaintiff heard a rumbling from the parking lot. She went to the window and noted that a roller was beginning to spread asphalt on the surface of the lot within a few feet of the window. Vapors from the asphalt entered through the window and were inhaled by plaintiff.
8. Within a few minutes, plaintiff began to feel tired and experienced a burning sensation in her throat and lungs. She began to vomit and told a co-worker she was having trouble breathing. Emergency Medical Services were called and plaintiff was taken to the emergency room at Forsythe Medical Center. Plaintiff experienced an acute bronchospastic episode and was treated with albuterol. Her breathing problems resolved sufficiently to permit her release from the emergency room. Plaintiff was referred to Dr. Matthews for follow-up care.
9. Plaintiff presented to Dr. Matthews on October 28, 2002. Plaintiff noted to Dr. Matthews that on the morning of her acute episode, the floors at the center had recently been waxed, she had been exposed to and inhaled vapors from the paving project, and a recently installed HEPA filter had not been operating.
10. Dr. Matthews "significantly" increased plaintiff's dosage of Prednisone to 60 milligrams per day and wrote her out of work from October 24, 2002 through November 25, 2002 in order to allow the increased dosage to begin to control plaintiff's bronchospasm.
11. Plaintiff returned to Dr. Matthews on December 2, 2002 with continuing complaints of coughing and problems breathing. By December 2002, plaintiff's dosage of Prednisone had been decreased to ten milligrams per day, which was the treatment level prior to the October 24, 2002 incident. Dr. Matthews continued plaintiff out of work through January 3, 2003.
12. On December 10, 2002, plaintiff returned to Dr. Matthews, who decided that plaintiff should attempt a gradual return to work for four days a week, six hours per day, beginning on December 11, 2002. Dr. Matthews also referred plaintiff to Dr. Shawn Murphy at Salem Chest Specialists who diagnosed asthma and mild restrictive disease after completing pulmonary functioning testing of plaintiff.
13. On January 13, 2003 plaintiff saw Dr. Ross for an upper respiratory infection. Plaintiff had no asthmatic or bronchitic symptoms during the examination by Dr. Ross.
14. On January 24, 2003, Dr. Matthews allowed plaintiff to return to work eight hours per day, four days per week. On April 4, 2003, Dr. Matthews increased plaintiff's work to 36 hours per week and on July 14, 2003, Dr. Matthews took plaintiff off Prednisone and allowed her to return to work full time. Plaintiff continued to work full-time for defendant as of the Deputy Commissioner's hearing.
15. At her deposition, Dr. Matthews stated that it is normal for asthmatics to have flareups and then return to pre-flareup baseline. She further stated that asthmatics are more sensitive to fumes, dust and other potential irritants than the average person. Prior to the incident on October 24, 2002 plaintiff's asthmatic condition was not at baseline. By December 10, 2002 plaintiff had returned to the level of treatment that existed prior to the October 24, 2002 incident. Dr. Matthews believed that plaintiff returned to baseline as of July 14, 2003 when she returned to full-time employment and was taken off Prednisone.
16. Dr. Matthews felt that plaintiff's exposure to asphalt fumes on October 24, 2002 was a causal factor in the onset of a prolonged flare of asthma which took months to resolve and disabled her from any employment from October 24, 2002 through December 11, 2002. Dr. Matthews stated that the acute episode on October 24, 2002 was the only incident of this magnitude in plaintiff's medical history since plaintiff began treating with Dr. Matthews. At her deposition Dr. Matthews explained that plaintiff "never had a clinical episode to this degree, requiring this long of PO Prednisone, ever, in the time that I have taken care of her. Even in the setting of the Student Health Clinic." Dr. Matthews further commented that "the asphalt was the main piece of the pie."
17. While plaintiff was aware that the work exposure to dust and construction was an irritant to her condition, she had been working in the building for more than four years as of October 24, 2002, and had successfully treated and controlled her chronic asthma through medication. The evidence shows that the paving in the parking lot had only begun on the date in question, and plaintiff had no basis for believing that approaching the window to observe the source of the rumbling noise would expose her to asphalt vapors and the resulting immediate symptoms.
18. Based upon the greater weight of the evidence, the Full Commission finds that on October 24, 2002, plaintiff suffered an injury by accident arising out of and in the course of her employment when she inhaled asphalt vapors and significantly aggravated her pre-existing chronic asthma. The inhalation of asphalt vapors constituted an unlooked for and untoward event, which was an interruption of plaintiff's normal work routine.
19. The Full Commission further finds that as a result of the injury by accident of October 24, 2002, plaintiff was totally disabled from any employment from October 24, 2002 through December 10, 2002. Any partial disability after December 11, 2002 was due to her pre-existing underlying chronic asthma and not causally related to the compensable injury by accident.
 ***********
Based upon the foregoing Stipulations and Findings of Fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. An injury by accident is defined under the Act as an unlooked for and untoward event, which is not expected or designed by the injured employee. N.C. Gen. Stat. § 97-2(6); Adams v. Burlington Industries,61 N.C. App. 258, 300 S.E.2d 455 (1983). In this case plaintiff's inhalation of asphalt fumes on October 24, 2002 constituted an interruption of her work routine and introduced unusual conditions resulting in unexpected consequences. See, Calderwood v.Charlotte-Mecklenburg Hosp. Auth., 135 N.C. App. 112, 519 S.E.2d 61
(1999), disc. review denied, 351 N.C. 351, 543 S.E.2d 124 (2000). The inhalation of asphalt fumes combined with and significantly aggravated her pre-existing disease to produce the injury by accident. Mills v. Cityof New Bern, 122 N.C. App. 283, 468 S.E.2d 587 (1996). Therefore, on October 24, 2002, plaintiff sustained an injury by accident arising out of and in the course of her employment with defendant. N.C. Gen. Stat. §97-2(6).
2. As a result of the compensable injury, plaintiff was disabled from any employment and is entitled to temporary total disability compensation at the rate of $474.28 per week for the period from October 24, 2002 through December 10, 2002. N.C. Gen. Stat. § 97-29. Plaintiff is not entitled to compensation for any partial disability after December 11, 2002 in that such disability was due to her pre-existing underlying disease and not causally related to the compensable injury by accident. N.C. Gen. Stat. § 97-30.
3. Plaintiff is entitled to have defendant pay for medical expenses incurred as a result of the compensable injury that provided relief, effected a cure or lessened the period of disability. N.C. Gen. Stat. §§97-2(19); 97-25. However, plaintiff is not entitled to payment by defendant of medical treatment for her asthmatic condition after December 10, 2002.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Subject to a reasonable attorney's fee approved below, defendant shall pay temporary total disability compensation to plaintiff at the rate of $474.28 per week for the period from October 24, 2002 through December 10, 2002. This compensation has accrued and shall be paid in a lump sum.
2. Defendant shall pay medical expenses incurred when bills for the same have been approved, in accordance with the provisions of the Act. Defendant is not responsible for payment of medical treatment for plaintiff's asthma after December 10, 2002.
3. A reasonable attorney's fee of 25% of the compensation awarded to plaintiff in Paragraph 1 above is hereby approved to be deducted from sums due plaintiff and paid directly to plaintiff's counsel.
4. Defendant shall pay the costs, including the expert witness fees of Drs. Ross and Matthews.
This the 1st day of April 2005.
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
 S/_______________ DIANNE C. SELLERS COMMISSIONER
LKM/mlb